**FERROSTAAL METALS CORPORATION,**
Plaintiff,

v.

**UNITED STATES, Defendant.**

**Court No. 86–12–01610.**

United States Court of International Trade.

June 26, 1987.

Baker & McKenzie (William D. Outman, II, B. Thomas Peele and Thomas P. Ondeck), Washington, D.C., for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Civ. Div., Dept. of Justice, New York City, for defendant.

**536**

## Memorandum Opinion and Order

DiCARLO, Judge:

The question presented in this case is whether plaintiff's importation of steel sheet which has been annealed and galvanized in New Zealand by a process known as "continuous hot-dip galvanizing" using full hard cold rolled steel sheet from Japan is covered by the Arrangement Between the Government of Japan and the Government of the United States of America Concerning Trade in Certain Steel Products ("Arrangement"). The Court holds that the merchandise is not covered by the Arrangement since the operations performed in New Zealand constituted a substantial transformation of the Japanese full hard cold rolled steel sheet.

I

Plaintiff entered merchandise at the Port of Seattle on July 17, 1986, August 26, 1986 and September 19, 1986 consisting of unpainted galvanized steel sheet galvanized in New Zealand by the continuous hot-dip galvanizing process, and painted galvanized steel sheet galvanized and painted by coil-coating in New Zealand. The material which was subjected to the continuous hot-dip galvanizing process to produce the galvanized (or galvanized and painted) steel sheet was full hard cold-rolled steel sheet from Japan. Plaintiff's entry documents identified New Zealand as the exporting country and the country of origin.

On October 24, 1986, the District Director of Customs at the Port of Seattle issued a notice of redelivery requiring redelivery of the entered merchandise unless plaintiff furnished Customs a Japanese export certificate issued pursuant to the Arrangement. The notice of redelivery was based on a ruling issued by Customs on August 25, 1986 that continuous hot-dip galvanizing, with or without painting, is not a process that results in a substantial transformation so as to change the country of origin of full hard cold-rolled steel sheet.

On November 26, 1986, approximately one month after issuance of its Notice of Redelivery, plaintiff filed a timely protest contesting issuance of the notice. Attached to the protest was a 17–page memorandum detailing plaintiff's argument that the steel sheet was not covered by the Arrangement since it had been substantially transformed in New Zealand. The protest was denied on December 2, 1986 on the basis of the earlier customs ruling.

Plaintiff filed a summons and a complaint setting forth a claim under section 515 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1515 (1982), contesting the denial of the protest and the administrative decision of Customs as applied to the protested entries. Plaintiff simultaneously moved for an order to show cause why a preliminary injunction should not issue (1) to permit, free of any requirement of export certificates, entry and delivery to its United States customers of steel sheet which had arrived in or was en route to the United States before plaintiff learned of the applicable customs ruling, and (2) to permit, free of any requirement of export certificates, entry and sale of the subject merchandise during the pendency of this action. Jurisdiction was alleged under 28 U.S.C. §§ 1581(a) and (i).

At oral argument on the motion for a preliminary injunction, plaintiff offered proof that the merchandise was susceptible to corrosion and argued that the customs ruling effectively prevented plaintiff from delivering similar merchandise en route to the United States and merchandise subject to other protests not yet denied and incapable of review under section 1581(a). The Court did not issue an injunction, however, on the ground that the injunction would grant the ultimate relief sought by plaintiff. The Court consolidated the motion with the trial on the merits and ordered expedited review. Trial was held from March 9 through March 12, 1987, and briefing was completed on June 10, 1987.

II

■ This case is one which comes within the exclusive jurisdiction of the Court under 28 U.S.C. § 1581(a) (1982), which covers "any civil action commenced to contest the denial of a protest, in whole or in part,

under section 515 of the Tariff Act of 1930 [19 U.S.C. § 1515]." Section 1515 authorizes the review of protests filed under section 1514 challenging "decisions of the appropriate customs officer, including the legality of all orders and findings entering the same, as to—... (4) the exclusion of merchandise from entry or delivery or a demand for redelivery to customs custody under any provision of the customs laws...." 19 U.S.C. § 1514(a)(4) (1982). Thus, the customs ruling forming the basis for the issuance of the notice of redelivery is subject to review in this action under section 1581(a). Under 28 U.S.C. § 2640(a)(1) the present case is a *de novo* proceeding, and the decision of the customs official at issue is presumed to be correct under 28 U.S.C. § 2639(a)(1).

The Court declines to exercise jurisdiction under 28 U.S.C. § 1581(i), the so-called residual jurisdiction of the Court. The Court exercises jurisdiction under section 1581(i) rarely, such as when the relief available in an action brought under section 1581(a) would be manifestly inadequate or when necessary because of special circumstances to avoid extraordinary and unjustified delays caused by the exhaustion of administrative remedies. *Lowa, Ltd. v. United States*, 5 CIT 81, 561 F.Supp. 441 (1983), *aff'd*, 724 F.2d 121 (Fed.Cir.1984). *United States Cane Sugar Refiners' Ass'n v. Block*, 3 CIT 196, 544 F.Supp. 883, *aff'd*, 69 CCPA 172, 683 F.2d 399 (1982); *Springfield Industries Corp. v. United States*, 11 CIT ——, 655 F.Supp. 506 (1987).

There is no futility in exhausting administrative remedies where the protest challenges a substantial transformation decision promulgated and subject to reconsideration by Customs. Furthermore, the current reviewability of the August 25, 1986 Customs ruling belies any perceived inadequacy or unjustifiable delay associated with the jurisdiction provided under section 1581(a). As such, jurisdiction under section 1581(a) provides plaintiff an adequate remedy notwithstanding that the action covers only the entries that are the subject of the protest denied by Customs.

## III

The Court turns to the dispositive question whether the operations performed in New Zealand on full hard cold-rolled steel sheet from Japan involved a substantial transformation, thereby rendering the imported steel a product of New Zealand.

Substantial transformation is a concept of major importance in administering the customs and trade laws. In addition to its role in identifying the country of origin of imported merchandise for purposes of determining dutiable status, or, as in this case, the applicability of a bilateral trade agreement, substantial transformation is the focus of many cases involving country of origin markings, *see, e.g., National Juice Products Ass'n v. United States*, 10 CIT ——, 628 F.Supp. 978 (1986), and cases involving American goods returned, *see, e.g., Upjohn Co. v. United States*, 9 CIT ——, 623 F.Supp. 1281 (1985).

The essence of these cases is that a product cannot be said to originate in the country of exportation if it is not manufactured there. The question, therefore, is whether operations performed on products in the country of exportation are of such a substantial nature to justify the conclusion that the resulting product is a manufacture of that country. "Manufacture implies a change, but every change is not manufacture.... There must be transformation; a new and different article must emerge, 'having a distinctive name, character, or use.'" *Anheuser-Busch Brewing Ass'n v. United States*, 207 U.S. 556, 562, 28 S.Ct. 204, 206, 52 L.Ed. 336 (1908). The criteria of name, character and use continue to determine when substantial transformation has occurred, and the prior cases of this court and our predecessor and appellate courts provide guidance in the application of this test.

◼ The Court finds it necessary to address two arguments raised by defendant before applying the criteria to the merchandise in question. These are (1) that name, character and use provide only part of the controlling test of whether the "essence" of the product has been altered, which may not be satisfied despite changes in name,

character and use; and (2) even though changes have occurred which would ordinarily result in a finding of substantial transformation, a different result may be found in the context of an agreement designed to restrict imports, where the Court may apply different criteria requiring more substantial changes in the imported product.

Defendant's suggestion that an "essence" test has displaced name, character and use is attributed to the Court's decisions in *National Juice Products, supra,* and *Uniroyal, Inc. v. United States,* 3 CIT 220, 542 F.Supp. 1026 (1982), *aff'd,* 702 F.2d 1022 (Fed.Cir.1983). In *National Juice Products,* however, the Court specifically applied the criteria of name, character and use in determining that orange juice manufacturing concentrate is not substantially transformed in the process that converts the concentrate into frozen concentrated, or reconstituted, orange juice. Although the Court used the word "essence" in describing the character of the merchandise, the focus of the Court's analysis was the traditional character criterion: "The addition of water, orange essences, and oils to the concentrate, while making it suitable for retail sale, does not change the fundamental character of the product, it is still essentially the product of the juice of oranges." 628 F.Supp. at 991.

*Uniroyal* held that footwear uppers were not exempted from country of origin marking requirements since the attachment of outsoles to the uppers did not constitute a substantial transformation within the meaning of 19 C.F.R. §§ 134.1(d) and 134.-35. While the Court referred to the uppers as "the very essence of the completed shoe," it made clear that "the test to be applied is whether the imported article has undergone a 'substantial transformation' which results in an article having a name, character or use differing from that of the imported article." 3 CIT at 224, 542 F.Supp. at 1029–30.

The Court finds that there is no basis in caselaw for the essence test offered by defendant. Defendant cites no case where the name, character and use criteria were satisfied, yet no substantial transformation was found to have occurred. The name, character and use test is entitled to continued adherence in view of its affirmance in recent opinions by our appellate court. *See Torrington Co. v. United States,* 764 F.2d 1563 (Fed.Cir.1985); *Belcrest Linens v. United States,* 741 F.2d 1368 (Fed.Cir. 1984).

■ The argument that the Court should apply a more stringent test depending on the context in which the substantial transformation issue arises is similarly misplaced. Defendant says that "decisions of the courts hold that the various criteria applied in substantial transformation cases must be considered in light of the objectives of the statute in question.... Thus, in this case, where the purpose of the VRA and its statutory foundations is to limit imports of Japanese steel products and to foster the growth of the American steel industry, the nature of the overall changes which occur to the product in New Zealand must be more substantial than when a statute fostering operations in a foreign country are being construed." Post-trial brief for defendant at 33.

Among the cases cited by defendant is *National Juice Producers, supra,* which provides a footnote referring to three statutes involving substantial transformation. The Court found the language of tests applying the statutes "similar" and predicted that results under the tests may differ "where differences in statutory language and purpose are pertinent." 628 F.Supp. at 988–89, n. 14. However, none of the cases cited even remotely suggests that the Court depart from policy-neutral rules governing substantial transformation in order to achieve wider import restrictions in particular cases.

In this case, the bilateral agreement between the United States and Japan is designed to limit steel imports from Japan, not to limit imports of steel generally. Under these circumstances the standard rule for substantial transformation should be applied to determine whether steel is covered by the Arrangement. No legitimate purpose is served by employing some other

test in order to bring within the terms of the Arrangement steel which the United States has not attempted to restrict. As a practical matter, multiple standards in these cases would confuse importers and provide grounds for distinguishing useful precedents. Thus, the Court applies the substantial transformation test using the name, character and use criteria in accordance with longstanding precedents and rules.

All of the merchandise involved was galvanized in New Zealand. Galvanizing involves coating the steel with zinc so as to improve its resistance to rust. The merchandise also underwent a process of annealing which restores the ductility of the steel which is lost in the cold rolling process performed in Japan. Other operations such as painting were performed on some but not all of the merchandise. Thus, if the galvanizing and annealing processes result in a substantial transformation of the merchandise, there is no need to consider the effect further operations have in transforming some, but not all, of the merchandise.

Whether galvanizing and annealing change the character of the merchandise depends on the nature of these operations and their effect on the properties of the materials. In making this determination the Court makes the following factual findings. Annealing is the first step in the continuous hot-dip galvanizing process. This step involves the controlled heating and cooling of the steel sheet in a furnace which relieves the deformation energy in full hard-cold rolled steel sheet and makes the steel less strong, but more ductile, or formable. The furnace has 20 different zones correlating to various time and temperature patterns. To produce one of the types of imported sheet, known in the industry as ASTM A446 Grade A, the sheet must be heated to 1350°F, at which point recrystalization of the grains of steel occurs. The sheet is then brought down to 880°F, before galvanizing begins.

Other grades of imported sheet are heated to as much as 1450°F or only to 1050°F before cooling to 880°F, depending on the degree of strength and formability sought in the end product. Although the process affects the distribution of carbon and nitrogen in the sheet, annealing does not change the actual chemical composition and dimensions of the sheet. "Recrystalization annealing," which describes the process applied to ASTM A446 Grade A, substantially eliminates defects in the sheet. "Recovery annealing," used to produce ASTM A446 Grade E, is heated only to 1050°F, and also reduces defects in the sheet. But in the view of one of plaintiff's witnesses, recovery annealing, although more difficult to carry out due to the importance of temperature control, results in a transformation less substantial than that resulting from recrystalization annealing, since steel grains do not form, grow or change shape during recovery annealing. Transcript at 254–57.

At 880°F, the sheet enters a pot of molten zinc and is dipped. The molten zinc reacts immediately with the solid steel, and begins a process known as "alloying." Alloying constitutes a chemical change in the product, characterized by the formation of iron-zinc alloys at the interface between the steel and the zinc. Tr. at 127–28. The galvanized steel sheet emerging from the bath has a mixed zinc-steel surface with an identifiable atomic pattern. The formation of a galvanized surface is an irreversible process which provides electrochemical protection to the sheet. As a result of the galvanic protection, the steel will last up to twenty years, or ten times as long as ungalvanized steel.

Defendant argues that the continuous hot-dip galvanizing process is merely a "finishing" process carried out to improve certain performance characteristics of the steel sheet. The government's sole witness testified that dimension and shape are the important characteristics distinguishing different steel products. Tr. at 552–56. According to defendant, annealing, which significantly alters mechanical properties, does not involve a substantial transformation since affects properties that are inherent in the steel.

The Court is not persuaded that annealing cannot contribute to a substantial transformation merely because steel is inherently susceptible to changes in ductility. The Court finds that strength and ductility constitute important characteristics of the steel and that annealing significantly affects the character by dedicating the sheet to uses compatible with the strength and ductility of the steel. A change in the end uses of products, *see infra,* is itself indicative of a change in the character of the product. *United States v. International Paint Co.,* 35 CCPA 87, C.A.D. 376 (1948).

The Court has held in another context that annealed sheet glass became a different commercial article when it underwent a tempering process in Canada. In *Guardian Industries Corp. v. United States,* 3 CIT 9 (1982) [Available on WESTLAW, DCT database], the Court held that by increasing tensions and stresses in the annealed glass through a process of heating and rapid cooling, the resulting tempered glass was transformed "in name, use, performance characteristics and tariff classification." *Id.* at 16. The Court considered in particular that while annealed glass can withstand approximately 7,000 pounds of pressure per square inch, tempered glass can withstand approximately 22,000 pounds of pressure per square inch. *Id.* at 11. In this case, such change also results from the annealing process. Whereas full hard cold-rolled steel sheet has a strength of approximately 80,000 pounds per square inch, after annealing the sheet has a strength of between 28,000 and 60,000 pounds per square inch depending on grade. Tr. at 605–06.

Defendant also minimizes the effect of galvanizing on the character of steel sheet. Its witness described zinc coating as one of many forms of coating which have the common function of protecting a steel sheet so that it can be used for its intended purpose. Zinc coating has a single function, which is "to protect the steel sheet when it's being used in a variety of different applications to protect it from corrosion." Tr. at 558. According to defendant, the steel itself, with all its inherent properties constitutes the essence of the product, while zinc coating is merely a finishing operation designed to protect the steel.

The Court does not agree with the argument that zinc coating is insignificant because a substantial transformation cannot occur in steel sheet once it is shaped. The alloy-bonded zinc coating affects the character of the sheet by changing its chemical composition and by providing corrosion resistance.

The Court also finds that the hot-dip galvanizing process is substantial in terms of the value it adds to full hard cold-rolled steel sheet. The evidence showed that the Japanese product is sold for approximately $350 per ton, while the hot-dipped galvanized product is sold for an average price of $550 to $630 per ton. Tr. at 114, 190–91, 278.

Taken as a whole, the continuous hot-dip galvanizing process transforms a strong, brittle product which cannot be formed into a durable, corrosion-resistant product which is less hard, but formable for a range of commercial applications. Defendant's witness stated that the imported sheet has a "different character from the standpoint of durability." Tr. at 612. The Court finds that the annealing and galvanizing processes result in a change in character by significantly altering the mechanical properties and chemical composition of the steel sheet.

The Court also finds substantial changes in the use of the steel sheet as a result of the continuous hot-dip galvanizing process. Testimony at trial overwhelmingly demonstrated that cold-rolled steel is not interchangeable with steel of the type imported, nor are there any significant uses of cold-rolled sheet in place of annealed sheet. Tr. at 170, 230, 258, 363, 412–13. Defendant's witness stated that the frequency with which the two types of steel compete with or are interchangeable with each other is "very limited," perhaps less than one or two percent. Tr. at 647.

Witnesses having expertise with respect to the construction and building industry testified as to the lack of interchangeability between the products, and stated that

building codes governing various building and construction applications would nonetheless prevent substitution by requiring that galvanized products be used. Tr. at 428–33.

The inability to form full cold rolled steel sheet also prohibits its substitution for annealed steel sheet. Testimony showed that in the automobile industry only annealed steel, and not cold-rolled steel, can be used to make parts that require at least a moderate amount of forming, such as fenders. Tr. at 282–84.

Finally, despite conflicts in the testimony of the parties' witnesses concerning the applicability of the terms "semi-finished" and "finished" to the products before and after processing, it is clear that while continuous hot-dipped galvanized steel can be put to a variety of end uses, the evidence showed that with very few exceptions, cold rolled steel is not put to end uses without some form of heat treatment. Tr. at 664–65. Such a change in the utility of the product is indicative of a substantial transformation. *See Midwood Industries, Inc. v. United States*, 64 Cust.Ct. 499, C.D. 4026, 313 F.Supp. 951, *appeal dismissed*, 57 CCPA 141 (1970) (transition from "producers' goods" to "consumers' goods"). Based upon all of the evidence presented, the Court finds that the continuous hot-dip galvanizing process causes a change in the use of the steel sheet.

The name criterion is generally considered the least compelling of the factors which will support a finding of substantial transformation. *National Juice Producers*, 628 F.Supp. at 989, ("a change in the name of the product is the weakest evidence of a substantial transformation"); *see Uniroyal, Inc. v. United States*, 3 CIT 220, 542 F.Supp. 1026 (1982), *aff'd*, 702 F.2d 1022 (Fed.Cir.1983); *United States v. International Paint Co.*, 35 CCPA 87, C.A.D. 376 (1948). Nonetheless, the satisfaction of the name criterion in this case lends support to plaintiffs' claim. The witnesses for both parties testified that the processing of full hard cold rolled steel sheet results in a product which has a different name, continuous hot-dip galvanized steel sheet. Tr. at 135, 612.

■ The Court also considers relevant whether the operations underlying the asserted transformation have effected a change in the classification of the merchandise under the Tariff Schedules of the United States (TSUS). Change in tariff classification may be considered as a factor in the substantial transformation analysis. *Belcrest Linens*, 741 F.2d at 1372–73; *see Chemo Puro Mfg. Corp. v. United States*, 34 Cust.Ct. 8, C.D. 1668, 146 F.Supp. 178 (1954). Here this factor supports a substantial transformation. Full hard cold rolled steel sheet is classified under item 607.83, TSUS, while continuous hot-dip galvanized steel sheet is classifiable under item 608.13, TSUS.

■ Based on the totality of the evidence, showing that the continuous hot-dip galvanizing process effects changes in the name, character and use of the processed steel sheet, the Court holds that the changes constitute a substantial transformation and that hot-dipped galvanized steel sheet is a new and different article of commerce from full hard cold-rolled steel sheet.

One further argument of defendant's remains to be discussed. Defendant says that "the Government's position here as to the scope of the VRA, regardless of whether there has been a substantial transformation, is that it covers an arrangement product, so long as any processing does not take an article out of a product category covered by the VRA." Post-trial brief for defendant at 27 n. 8. This apparently would mean that regardless whether imported steel is, under the law, a product of a country other than Japan, Customs may require that importers present Japanese export certificates whenever the new and different articles of commerce resulting from a substantial transformation happen to be covered by another provision of the Arrangement. This argument flows from defendant's position that given a broad interpretation of the Arrangement's purpose to "restrain exports ... destined for consumption in the United States of America of products ... originating in Japan," the

Court should find that all imported steel products made from Japanese substrate are destined for consumption in the United States and thus covered by the Arrangement. Defendant argues that this finding is particularly appropriate in this case, in light of evidence that the Japanese steel used for processing in New Zealand is sized to special inch dimensions required by United States customers, which demonstrates that the steel is destined for the United States before it is shipped to New Zealand.

The Court concludes that this rationale is not germane to the issues in this case. Only in defendant's briefs does such an interpretation of the Arrangement appear. Defendant fails to show that this position played any role in causing the issuance of the notice of redelivery, relying instead on the proposition that "subsumed in the decision is a presumption that all facts necessary to the conclusion were found to exist." Pretrial brief for defendant at 8 (citing *New York Merchandise Inc. v. United States*, 59 CCPA 127, C.A.D. 1052, 459 F.2d 1047 (1972)).

Defendant's theory was neither capable of constituting a factual finding nor necessary to the conclusion of the appropriate Customs official that redelivery notices should issue. Customs decision was based solely on a substantial transformation analysis.

Defendant's argument that substantial transformation rules do not govern country of origin decisions under the Arrangement also appears to have been contradicted by the consultations between the governments of the United States and Japan concerning the Arrangement. The United States stated that there were several options available to third countries faced with problems as a result of processing Japanese steel covered by the Arrangement: "These countries could (1) challenge the U.S. Customs ruling on substantial transformation, (2) obtain Japanese certificates or (3) negotiate VRA's with these countries, providing for a certain amount of Japanese origin steel." *Minutes—U.S.-Japan Consultations—Tokyo, Dec. 1-2, 1986* (Exhibit 30, Doc. C). The controlling nature of substantial transformation rules is shown further by the Japanese complaint that Customs rulings on substantial transformation are "ex post facto to the U.S.-Japan Arrangement," and that if Japan were responsible for issuing certificates for steel processed in third countries, "its ceiling under the Arrangement should be increased." *Id.*

Other sources contradict defendant's position that substantial transformation is immaterial. For example, in a letter to the president of an association of steel service centers dated February 26, 1987, the Acting Director of the Classification and Value Division of the United States Customs Service stated on behalf of the government that: "Under the origin requirements of the VRA's, a steel product remains a product of the country in which it was produced unless it is substantially transformed by processing in another country." The Court holds that defendant's argument concerning the scope of the Arrangement and the materiality of the substantial transformation rules is erroneous.

## IV

In conclusion, the Court holds that the customs ruling that Japanese full hard cold-rolled steel sheet is not substantially transformed by continuous hot-dip galvanizing in New Zealand is erroneous, and that issuance of the notice of redelivery covering the entries that are the subject of this case was improper. Defendant's motion for a stay of judgment is denied. Judgment will be entered accordingly. So ordered.

## JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein, now in conformity with said decision,

IT IS HEREBY ORDERED that the District Director of Customs at the port of Seattle shall cancel the notice of redelivery dated October 24, 1986 relating to the entries numbered 86–235794–6, 86–204484–8 and 86–204530–0.