**KORU NORTH AMERICA, Plaintiff,**

v.

**UNITED STATES, Defendant.**

Court No. 88–04–00293.

United States Court of
International Trade.

Nov. 23, 1988.

Coudert Brothers, Robert L. Eisen and Michelle S. Benjamin, New York City, for plaintiff.

John R. Bolton, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Attorney in Charge, Intern. Trade Field Office, Commercial Litigation Branch, U.S. Dept. of Justice Michael P. Maxwell and Barbara Epstein, New York City, of counsel, Karen P. Binder, U.S. Customs Service, New York City, for defendant.

## OPINION

TSOUCALAS, Judge:

Plaintiff, Koru North America, brings this action to contest the United States Customs Service's (Customs) exclusion of frozen Hoki fillets that entered through the port of Seattle under entry # 110–0659025–8 on February 23, 1988. Upon determining that plaintiff improperly marked the subject merchandise as a "Product of New Zealand," rather than as a "Product of the Soviet Union," for country of origin purposes, Customs issued a Notice of Redelivery with respect to these goods. Plaintiff claims that since the prod-

uct was correctly marked, Customs improperly issued the Notice of Redelivery.

### Background

The fish, known as the "New Zealand Hoki,"[1] were caught off the shores of New Zealand within its Exclusive Economic Zone (EEZ).[2] They were caught by ships chartered by Fletcher Fishing, Ltd. (Fletcher), the largest fishing company in New Zealand, while flying the flags of New Zealand, Japan and the Union of Soviet Socialist Republic.[3] The fish were beheaded, detailed, eviscerated and frozen aboard the ships within New Zealand's EEZ, then landed and offloaded in New Zealand where they were commingled and stored under Fletcher's control. The initial processing aboard the vessel had to conform with all of New Zealand's fishing laws and regulations.

Once ashore, the fish were inspected and certified by the New Zealand Ministry of Agriculture and Fisheries as being of New Zealand origin, fit for human consumption and caught in conformity with the requirements imposed by New Zealand.

The fish were then sent to Korea for further processing; they were thawed, skinned, boned, trimmed, glazed, refrozen and packaged for exportation to the United States.

The merchandise arrived in the United States in cartons marked "Product of New Zealand." Customs issued a Notice of Redelivery against the merchandise in its condition marked as imported. Customs' position is that the fish caught and commingled should be labeled "Product of the Soviet Union, Japan and New Zealand," based on the doctrine of the Law of the Flag. It

---

1. The scientific name is Macruronus Novaezelandiae Hector, *see Plaintiff's Brief in Support of its Motion for Partial Summary Judgment* at 6–7 [hereinafter *Plaintiff's Brief*].

2. New Zealand defines its EEZ as those areas of sea, beyond and adjacent to the territorial sea, having as their outer limits a line measured seaward from the defined baseline every point of which is 200 nautical miles from the nearest point of the baseline. *Id.* at 7. New Zealand's definition is in accordance with the definition provided in the United Nations Convention on

the Law of the Sea, A/Conf. 62/122, U.N. Sales No. E.83.V.5, Articles 55, 57 (1983).

3. Although Customs originally determined that the cartons should be marked only as a "Product of the Soviet Union," they have subsequently revised their position to require that the goods be marked as a "Product of the Soviet Union, Japan and New Zealand" because the fish were caught by vessels flying the flags of those countries. References in this opinion solely to the Soviet Union will, for the sake of brevity, be assumed to encompass Customs' latter intent.

reasons that since the EEZ is outside the territorial waters of a country, it is the high seas, and that fish caught on the high seas are products of the country of the flag of the catching vessel. Plaintiff, on the other hand, claims that the fish are products of New Zealand since they were caught within New Zealand's EEZ on behalf of a New Zealand company, and were at all times owned by that company.

At the hearing of this action and in their briefs, the parties presented arguments as to whether the fish are a product of New Zealand or a product of the Soviet Union, but sought to reserve judgment on the issue of whether the product was substantially transformed in South Korea, thereby rendering it a product of South Korea for country of origin purposes.

At the direction of the Court at oral argument, the parties briefed the issue pertaining to substantial transformation and agreed that the fish were substantially transformed in South Korea. The following discussion sets forth the Court's rationale for finding that substantial transformation occurred in South Korea.

### Discussion

#### A. The Law of the Flag

■ On the high seas, the country of origin of fish is determined by the flag of the catching vessel. *Procter & Gamble Mfg. v. United States*, 60 Treas. Dec. 356, T.D. 45099 (1931), *aff'd*, 19 CCPA 415, C.A. D. 3488, *cert. denied*, 287 U.S. 629, 53 S.Ct. 82, 77 L.Ed. 546 (1932).[4] In international law, a ship on the high seas is considered foreign territory, functionally, "a floating island of the country to which [it] belongs." *Thompson v. Lucas*, 252 U.S. 358, 361, 40 S.Ct. 353, 64 L.Ed. 612 (1920). *See also*

*Robbins (Inc.) v. United States*, 47 Treas. Dec. 261, T.D. 40728 (1925) (fish are characterized by their first taking).

Plaintiff maintains that "the maritime principle that the nationality of a vessel on the 'high seas' is determined by the flag it flies, is of no relevance to this particular controversy, because the fish in question were caught in the EEZ by registered New Zealand fishing vessels on behalf of the New Zealand industry and against its share of the total allowable catch."[5] *Plaintiff's Reply in Support of its Motion for Partial Summary Judgment, and in Opposition to Defendants' Cross–Motion for Partial Summary Judgment and Dismissal* at 18 (*Plaintiff's Reply* ). Plaintiff additionally claims that the foreign ships became *de facto* "New Zealand fishing vessels" despite being foreign owned and flagged because: (1) the fish were caught by vessels under charter to the New Zealand company, Fletcher, for the specific purpose of enabling Fletcher to exhaust its Hoki quota allocation; (2) the vessels were controlled by Fletcher and New Zealand laws; Fletcher owned all the fish caught and processed by the vessels; the vessels, which were temporarily imported for home consumption whereby Fletcher entered into a deed of covenant of NZ $700,000.00 for each vessel, were thought of as New Zealand fishing vessels by the New Zealand Ministry of Agriculture; and (3) the Director General consented to registration of the vessels as "New Zealand fishing vessels." *Plaintiff's Brief* at 24–27. Thus, plaintiff asserts that the proper country of origin is New Zealand.

■ However, plaintiff's fiction of *"de facto* New Zealand vessels" ignores that even though the ships were registered in New Zealand for purposes of fishing within

---

**4.** In *Procter & Gamble*, the merchant ships of a foreign country were found to be foreign territory, and whale oil produced upon them in the Antarctic Ocean under contract to a U.S. company was considered produced in a foreign country within the meaning of the statute involved. 19 CCPA at 417.

**5.** Under the quota management system implemented by New Zealand in the New Zealand Fisheries Act 1983 and the Fisheries Amendments 1986, Individual Transferable Quota

(ITQ) is first allocated by the New Zealand government to individuals and companies comprising the New Zealand fishing industry in order to allocate that industry's access to the fishing resource within New Zealand EEZ waters, in furtherance of New Zealand's fishery conservation and management regime. *See Plaintiff's Brief* at 8; *Plaintiff's Statement of Material Facts as to Which There is no Genuine Issue to be Tried* at 5, para. 24.

the EEZ, the ships maintained their Soviet registry, meaning, they flew the flag of the Soviet Union, applied Soviet law on board ship, and remained part of the sovereignty of the Soviet Union. The law of the flag has been found to "supersede[ ] the territorial principle ... because [the ship] 'is deemed to be a part of the territory of that sovereignty [whose flag it flies], and not to lose that character when in navigable waters within the territorial limits of another sovereignty,'" *Lauritzen v. Larsen,* 345 U.S. 571, 585, 73 S.Ct. 921, 929, 97 L.Ed. 1254 (1953) (quoting *United States v. Flores,* 289 U.S. 137, 155–59, 53 S.Ct. 580, 584–86, 77 L.Ed. 1086 (1933)), and "must prevail unless some heavy counterweight appears." *Id.* 345 U.S. at 586, 73 S.Ct. at 930. *Cf. Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970); *Gulf Trading & Transportation Co. v. M/V Tento,* 694 F.2d 1191 (9th Cir. 1982), *cert. denied,* 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983) (sufficient and substantial contacts with the United States satisfy the "heavy counterweight" requirement). Therefore, since the subject merchandise was caught and initially processed on Soviet territory, it originates from that country.

Plaintiff misinterprets the application of rights conveyed through the establishment of an EEZ.[6] The authority for establishing an EEZ derives from the United Nations Convention on the Law of the Sea (LOS Convention) where each country is provided with certain sovereign rights within its EEZ, specifically "sovereign rights for the purpose of exploring and exploiting, conserving and managing the natural resources, whether living or nonliving...." Article 56 of the LOS Convention. These rights need not be claimed by a coastal State to exist. *See* Art. 55, LOS Convention.

In interpreting the LOS Convention, plaintiff correctly observes that the fish are "natural resources within an area under New Zealand's sovereign jurisdiction and authority [i.e., the EEZ]," but carefully and correctly refrains from going so far as to state that the fish *are* natural resources of New Zealand. The distinction is significant because, according to the LOS Convention, a State is not provided with absolute sovereignty over the living natural resources within an EEZ. The State is only provided with "sovereign rights for the purpose of exploring and exploiting, conserving and managing the natural resources...." *Id.* "Sovereign rights" are not the equivalent of "sovereignty."[7] The State, therefore, possesses nothing more than a preferential fishing zone within its EEZ, which has been recognized as:

> not compatible with the exclusion of all fishing activities of other States. A coastal State entitled to preferential rights is not free, unilaterally and according to its own uncontrolled discretion, to determine the extent of those rights. The characterization of the coastal State's rights as preferential implies a certain priority, but cannot imply the extinction of the concurrent rights of other States.... The coastal State has to take into account and pay regard to other States....

1974 I.C.J. 1, 27.

■ Even though plaintiff would like this Court to equate the EEZ with the territorial sea, such a conclusion would be clearly improper, as certain elements of the high seas are retained in an EEZ. Specifically, the "freedoms ... of navigation and

---

6. The concept of an EEZ has been given legitimacy in international law. The number of States claiming such a zone, fifty-nine as of 1985, represents over two-thirds of all coastal States, including all industrial maritime States. Most EEZs generally conform to the regime set out in the United Nations Convention on the Law of the Sea and such widespread acceptance provides the necessary elements for international legal acceptance. The United States not only proclaims its own EEZ, but also recognizes the claims of foreign nations to an EEZ. Proclama-

tion No. 5030, 48 Fed.Reg. 10,605 (1983); *United States v. Rioseco,* 845 F.2d 299 (11th Cir.1988).

7. The characterization of the rights of the coastal State within an EEZ as "sovereign rights" rather than as "sovereignty" represents a deliberate compromise between the territorial and the jurisdictional theorists of the time. *See* O'Connell, *The International Law of the Sea,* Vol. 1 at 575 (1982).

overflight and of the laying of submarine cables and pipelines, and other internationally lawful uses of the sea related to these freedoms...." Art. 58 of the LOS. In addition, a State is free in its territorial sea to prohibit fishing by foreigners, monopolize the fishing resources and the exploitation thereof, and fully control those waters. Within an EEZ, however, the State retains control of the fishing resources only for the purpose of optimum utilization and to prevent the unnecessary exhaustion of resources.[8] In this regard, although the State retains the exclusive right to determine the amount of allowable catch, it is obligated to allocate the surplus among the other States. Art. 62 of the LOS. Consequently, it would be improper to characterize fish caught within a country's EEZ as originating from that country on the basis of their being caught within the EEZ.

■ The extra grant of jurisdiction to a State through its EEZ must be considered in light of the purposes of the marking statute. In ascertaining what constitutes the country of origin under the marking statute, a court must look at the sense in which the term is used in the statute, giving reference to the purpose of the particular legislation involved. *Procter & Gamble,* 19 CCPA at 422 (citing *Burnet v. Chicago Portrait Co.,* 285 U.S. 1, 52 S.Ct. 275, 76 L.Ed. 587 (1932)).

The purpose of the marking statute is outlined in *United States v. Friedlaender & Co.,* 27 CCPA 297, 302, C.A.D. 104 (1940), where the court stated that:

> Congress intended that the ultimate purchaser should be able to know by an inspection of the marking on imported goods the country of which the goods is the product. The evident purpose is to mark the goods so that at the time of purchase the ultimate purchaser may, by knowing where the goods were produced, be able to buy or refuse to buy them, if such marking should influence his will.

This purpose would be best served in the instant action by finding the fish to be

products of the Soviet Union, Japan and New Zealand since the catching and initial processing occurred on the vessels of these countries.

Plaintiff claims the marking statute requires that the nexus among the fish, the registration of the vessels and New Zealand be considered in making a country of origin determination. The term "country of origin" is defined in the regulations as:

> the country of manufacture, production, or growth of any article of foreign origin entering the United States.

19 C.F.R. § 134.1(b). The term "country" is defined as:

> the political entity known as a nation. Colonies, possessions, or protectorates outside the boundaries of the mother country are considered separate countries.

19 C.F.R. § 134.1(a).

Plaintiff contends that neither of the above definitions squarely addresses the present situation. The Court disagrees. The fish in the instant action were caught beyond the boundaries of the mother country (New Zealand), i.e., in an area which is not within the sovereignty of New Zealand but where New Zealand merely possesses preferential fishing rights. Therefore, the fish are a product of the Soviet Union, Japan and New Zealand, provided they have not been substantially transformed in South Korea.

### B. *Substantial Transformation*

■ The marking statute, section 304 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1304 (1982 & Supp. III 1985) requires all articles imported into the United States to "be marked in a conspicuous place as legibly, indelibly, and permanently [as possible] ... to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article." 19 U.S.C. § 1304(a). The country of origin of an article is defined as "the country of manufacture, production, or growth

---

8. *See generally* Comment, *The Exclusive Economic Zone: Its Development and Future in International and Domestic Law,* 45 La.L.Rev.

1269 (1985); Oda, *Fisheries Under the United Nations Convention on the Law of the Sea,* 77 Am.J.Int'l L. 739 (1983); O'Connell at 553–79.

of any article of foreign origin entering the United States." 19 C.F.R. § 134.1(b). In the instant action, that country would be either New Zealand, because the fish were caught in its claimed EEZ, or the Soviet Union, since the catches were made on board a Soviet-flag vessel. However, an important exception exists to the marking statute. When "[f]urther work or material added to an article in another country [would] effect a substantial transformation", such other country will be the "country of origin" within the meaning the statute. *Id.* The Court finds the procedures performed upon the fish in South Korea to constitute a "substantial transformation" within the meaning of the statute.

■ The country of origin marking statute was intended, *inter alia*, "to facilitate consumer purchasing decisions...." *National Juice Products Ass'n v. United States*, 10 CIT 48, 59 n. 15, 628 F.Supp. 978, 989 (1986). By indicating to consumers where a product was manufactured, the statute helps informed and discriminating buyers decide either "to buy or refuse to buy [a product] ... if such markings should influence [their] will." *Id.* at 58, 628 F.Supp. at 988 (citations omitted). Courts have developed several tests in determining whether substantial transformation has occurred. The most significant is the "name, character or use" test.[9] *Anheuser-Busch Brewing Ass'n v. United States*, 207 U.S. 556, 562, 28 S.Ct. 204, 206, 52 L.Ed. 336 (1907). A substantial transformation occurs where articles "lose their

identity as such, and become new articles having ... a new name, character, and use...." *United States v. Gibson-Thomsen Co.*, 27 CCPA 267, 270, C.A.D. 98 (1940). The "name, character and use" test is "entitled to continued adherence in view of its affirmance in recent opinions by our appellate court." *Ferrostaal Metals Corp. v. United States*, 11 CIT ——, ——, 664 F.Supp. 535, 538 (1987) (citing *Torrington Co. v. United States*, 3 Fed.Cir. (T) 158, 764 F.2d 1563 (1985); *Belcrest Linens v. United States*, 2 Fed.Cir. (T) 105, 741 F.2d 1368 (1984)).

■ The Customs Service has incorporated the name, character or use test of *Gibson-Thomsen* in its regulations. *See* 19 C.F.R. § 134.35. A processor who converts an imported article into a different article having a new name, character or use has substantially transformed the imported article, thereby requiring the markings on the product to reflect this change. *Id.*

■ The article need not experience a change in name, character *and* use to be substantially transformed. *United States v. International Paint Co.*, 35 CCPA 87, C.A.D. 376 (1948). Only one of the three prongs needs to be satisfied for a product to achieve substantial transformation. The name element, however, has received less weight and is considered "the weakest evidence of substantial transformation." *National Juice Products*, 10 CIT at 59, 628 F.Supp. at 989; *cf. Superior Products Co. v. United States*, 11 CIT at ——, 669

---

**9.** Three other tests are manifest from caselaw: (1) The "article of commerce" test focuses on whether a "new article of commerce" has emerged from the operations performed on the imported article, *see Carlson Furniture Industries v. United States*, 65 Cust.Ct. 474, C.D. 4126 (1970); (2) The "essence" test which yields substantial transformation if the imported article is an integral part of the whole product with which it is combined, *see Grafton Spools, Ltd. v. United States*, 45 Cust.Ct. 16, C.D. 2190 (1960); *The Diamond Match Co. v. United States*, 49 CCPA 52, C.A.D. 796 (1962); and (3) the "value added" test which requires the imported article to contribute significantly to the value of the final product. *See United States v. Murray*, 621 F.2d 1163 (1st Cir.), *cert. denied*, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980).

The plethora of tests results from the cases on substantial transformation being "very product specific and ... often distinguishable on that basis, rather than by their statutory underpinnings." *Superior Products Co. v. United States*, 11 CIT ——, ——, 669 F.Supp. 472, 479 (1987). Courts have not adhered rigidly to a single test because of "the importance of focusing on the facts of each case." *Coastal States Marketing, Inc. v. United States*, 10 CIT 613, 615, 646 F.Supp. 255, 257 (1986), *aff'd*, 818 F.2d 860 (Fed.Cir.1987) (citing *Belcrest Linens*, 2 Fed.Cir. (T) at 109, 741 F.2d at 1372). Courts find it "difficult to take concepts applicable to products such as textiles and apply them to combinations of liquids or fabrication of steel articles." *Superior Products*, 11 CIT at ——, 669 F.Supp. at 479. Nonetheless, the Court will apply only the name, character or use test in this case.

F.Supp. at 478 (changes in use or character were the predominant elements).

In the present action, the criteria for substantial transformation have been satisfied. The fish's name has been changed as the result of the processing method which occurred in Korea. When the fish arrive in Korea they are known as "headed and gutted" Hoki, as they have been beheaded, de-tailed and eviscerated. *Plaintiff's Response to Defendant's Statement of Material Facts as to Which There is No Genuine Issue to be Tried,* Exhibit A, Reply Affidavit of D.J. Easton (Easton Reply Affidavit), para. 2. The fish fillets exported from Korea to the United States, on the other hand, are known as "individually quick-frozen (IQF) fillets." *Id.* at para. 5(e). While change of name is not dispositive, "satisfaction of the name criterion" is evidence in favor of a finding of substantial transformation. *Ferrostaal Metals,* 11 CIT at ——, 664 F.Supp. at 541.

The fish's character, after its journey through Korea, is also vastly different from what it was upon departure from New Zealand. *Plaintiff's Reply Brief* at 9. The fish arrive in Korea, with the look of a whole fish, albeit without heads, tails or viscera, *see id.* at 9 (citing Easton Reply Affidavit, paras. 5(e) and (g)), whereas the fish that are exported from Korea have no skin or bones, "no longer possess the essential shape of the fish ... have been trimmed of jagged edges, fat lines and impurities, glazed to preserve their moisture and thereby enhance their shelf life, frozen to protect the fish from spoilage and finally, packaged." [10] *Id.* at 9. Additionally, the fillets are considered discrete commercial goods and are sold in separate areas and markets. *Id.* at 10. Unlike the product in *National Juice Products,* the fresh article here (the headed and gutted fish) undergoes its transformation into a processed retail product (fillet) in the second country (Korea). These changes go to the fundamental nature and character of the fish; the fish have been transformed, both in name and in character. Therefore, a new article of commerce has been created.

Moreover, as plaintiff points out, they have different tariff classifications. *Plaintiff's Reply Brief* at 10. Even though "proper tariff classification is not dispositive of whether the manufacturing process necessary to complete an article constitutes a substantial transformation," *Torrington Co.,* 3 Fed.Cir. (T) at 167, 764 F.2d at 1571 (citing *Belcrest Linens,* 2 Fed.Cir. (T) at 110, 741 F.2d at 1373), different tariff classifications are, nevertheless, additional evidence of substantial transformation. *Ferrostaal Metals,* 664 F.Supp. at 541.

### Conclusion

For the above reasons this Court finds that the Hoki were substantially transformed in South Korea and are thus a product of South Korea and should be properly marked as such. Additionally, had fish not been substantially transformed in South Korea they would have properly been marked as products of the Soviet Union, Japan and New Zealand.

### JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein, now, in conformity with said decision,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED: that the subject merchandise was substantially transformed in South Korea; and it is further

ORDERED, ADJUDGED, and DECREED: that the United States Customs Service shall enter the subject merchandise if properly marked a product of South Korea; and it is further

ORDERED, ADJUDGED, and DECREED: that plaintiff's motion for partial

---

**10.** The decision in *William Camp Co. v. United States,* 24 CCPA 142, 144, T.D. 48623 (1936), is extremely persuasive: "[T]here are many varieties of fish that are caught upon the high seas and not within the territorial limits of any country. In such case, clearly the place where packed, as the term 'packed' is used in [the relevant provision], would properly be considered the country of origin, and the words 'Packed in [that country]' would clearly indicate the country of origin."

236

summary jugment is denied; defendant's cross-motion for partial summary judgment is also denied; and except as provided above, this action is hereby dismissed.