**FORD MOTOR COMPANY,**
Plaintiff–Appellant,

v.

**UNITED STATES, Defendant–Appellee.**

No. 01–1052.

United States Court of Appeals,
Federal Circuit.

April 12, 2002.

Charles J. Cooper, Cooper, Carvin & Rosenthal, PLLC, of Washington, DC, argued for plaintiff-appellant. With him on the brief was David H. Thompson. Of

counsel on the brief were Steven H. Becker, Paul A. Horowitz, and Scott D. Shauf, Coudert Brothers, of New York, NY. With them on the brief was Paul Vandevert, Ford Motor Company, of Dearborn, MI.

Amy M. Rubin, Attorney, Civil Division, Commercial Litigation Branch, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General, and David M. Cohen, Director. Of counsel on the brief was Sheryl A. French, General Attorney, Office of Assistant Chief Counsel, United States Customs Service, of New York, NY.

Before RADER, SCHALL, and BRYSON, Circuit Judges.

Opinion for the court filed by Circuit Judge SCHALL. Dissenting opinion filed by Circuit Judge BRYSON.

SCHALL, Circuit Judge.

Ford Motor Company ("Ford") appeals the final decision of the United States Court of International Trade that sustained the denial, by the United States Customs Service ("Customs"), of Ford's protest concerning the liquidation of certain entries of merchandise. *Ford Motor Co. v. United States*, 116 F.Supp.2d 1214 (Ct. Int'l Trade 2000) ("*Ford II*"). In its decision, which followed a trial, the court held that Customs' three extensions, under 19 U.S.C. § 1504(b),[1] of the one-year time period for liquidating the entries under 19 U.S.C. § 1504(a) were legally permissible.

The court rejected Ford's contention that the extensions were unreasonable and that consequently the entries were "deemed liquidated" pursuant to section 1504(a) at the rate of duty asserted by Ford upon entry between December of 1985 and February of 1986, rather than at the rate of duty determined by Customs in December of 1989. Because we conclude that Ford established at trial that Customs' delay in liquidating the entries was unreasonable, we reverse and remand the case to the Court of International Trade for entry of judgment in favor of Ford.

BACKGROUND

I.

The relevant facts are set forth in our previous opinion in this case, *Ford Motor Co. v. United States*, 157 F.3d 849 (Fed. Cir.1998) ("*Ford I*"). They are as follows:

Ford operates an assembly plant in Louisville, Kentucky, at which it manufactures both cars and trucks using imported foreign engines and transmissions. *See Ford I*, 157 F.3d at 852. In 1983, Ford applied to establish a Foreign Trade Subzone ("FTSZ") at the plant, pursuant to 15 C.F.R. §§ 400.600–603.[2] Ford's application was approved, and an FTSZ was established at the Louisville plant. The Louisville FTSZ operated between November of 1985 and February of 1986. *Ford I*, 157 F.3d at 853.

An FTSZ is an area inside the United States that may receive treatment under

---

1. Unless otherwise indicated, all statutory citations are to the 1982 version of the United States Code, the relevant provisions of which were in effect, or equivalent to the provisions in effect, during the period of time pertinent to this case.

2. Unless otherwise indicated, all regulation citations are to the 1985 version of the Code of Federal Regulations, the relevant provisions of which were in effect, or equivalent to the provisions in effect, during the period of time pertinent to this case.

the Customs laws as a territory outside the United States. *See generally*, 15 C.F.R. § 400.1(c) (2000). At an FTSZ, an importer has the "choice of paying duties either at the rate applicable to the foreign material in its condition as admitted into a zone, or if used in manufacturing or processing, to the emerging product." *Ford I*, 157 F.3d at 852; *see also Armco Steel Corp. v. Stans*, 431 F.2d 779, 782 (2d Cir. 1970).

During the relevant time period, the duty rate published in the Tariff Schedules of the United States for cars imported into the United States was 2.6% *ad valorem*, while the duty rate for imported trucks was 25% *ad valorem*. The duty rate for engines and transmissions for both cars and trucks was 3.3%. Under these circumstances, the optimal exploitative strategy for Ford was to import engines and transmissions into the Louisville FTSZ, and then segregate those utilized to assemble cars from those utilized to assemble trucks. Ford planned to treat the segregated car parts as "foreign merchandise" (viewing the plant as being on foreign soil). It then would pay the 2.6% duty on the emerging "imported" car. At the same time, Ford planned to treat the segregated truck parts as "domestic merchandise" (viewing the plant as being on United States soil). It then would pay the 3.3% duty rate on the "imported" engines and transmissions, thereby avoiding the 25% duty rate for completed trucks.

Regulations that were in effect required that Ford conduct its FTSZ operations in a certain manner. First, it had to identify each part entering the Louisville FTSZ as either a car part or a truck part. Ford then had to designate all car parts as "non-privileged foreign" merchandise and all truck parts as "privileged domestic" mer-

chandise on a Customs Form 214 ("214 form"). *See* 19 C.F.R. § 146.12(a). To designate merchandise as either "non-privileged foreign" or "privileged domestic," the importer checks a box on the 214 form that is labeled with the corresponding designation. *See* 19 C.F.R. §§ 146.31, 146.32.

Duties on "non-privileged foreign" merchandise are not due and payable until the merchandise leaves the FTSZ. *See* 19 C.F.R. § 146.48(e); *see also* 19 C.F.R. § 146.23. Thus, Ford could defer payment of duties on car transmissions and engines until it had installed them in completed cars. In that way, Ford could capture the duty rate for cars (2.6%) rather than car parts (3.3%). Duties for "foreign domestic" merchandise, however, are due and payable upon entry of the merchandise into the FTSZ. *See* 19 C.F.R. § 146.22(a); *see also* 19 C.F.R. § 146.44. Thus, the regulations required that Ford pay the duty on engines and transmissions to be installed in trucks as they entered the FTSZ. In short, in order to operate the Louisville FTSZ in accordance with the applicable regulations, Ford had to determine and designate the future usage of each part. Then, based on that usage, Ford had to identify the correct FTSZ status for the part and make duty payments at the proper time.

During the three months it operated the FTSZ at its Louisville plant, Ford received eleven entries of merchandise from abroad. The merchandise consisted of transmissions and engines that Ford used in the manufacturing of vehicles. Apparently through error, however, Ford made incorrect entries with respect to the merchandise on the required 214 forms. Specifically, Ford's agent at the Louisville FTSZ designated each transmission and engine in the eleven entries it received at

the FTSZ between December of 1985 and February of 1986, including those labeled as truck parts, as "non-privileged foreign." Consequently, to the extent it intended to treat any of the entries as "privileged domestic," Ford failed to pay duties associated with these parts, as required by the governing regulations. *See* 19 C.F.R. § 146.22; *Ford I*, 157 F.3d at 853. Ford's 214 forms also were "replete with errors" regarding product descriptions, duty rates, and tariff item numbers. *Ford II*, 116 F.Supp.2d at 1218.

Ford reported its 214 form error to Customs. As a result of Ford's failure to designate the engines and transmissions destined for trucks as "privileged domestic," and therefore pay the applicable 3.3% *ad valorem* duty rate upon entry of the parts into the FTSZ, Customs asserted that the parts exited the FTSZ (and thus entered the United States) as parts of completed trucks and were thus subject to a 25% *ad valorem* duty. *Ford I*, 157 F.3d at 853.

In due course, Customs Agent Richard McNally began an investigation to determine the proper amount of duty that was due. In July of 1986, McNally prepared an initial internal report in which he concluded that the designations in Ford's 214 forms "had been improper, that the proper duty rate on the truck parts was 25%, and that Ford owed approximately $5.3 million in additional duties." *Id.* at 854. Further, citing the "significant amount of duty involved," McNally referred the case to Customs' Office of Enforcement/Investigation for a possible fraud investigation. *Ford II*, 116 F.Supp.2d at 1218. In August of

1986, pursuant to 19 U.S.C. § 1592,[3] Customs initiated a civil fraud investigation, which continued until at least March of 1990.

Pursuant to 19 U.S.C. § 1504(a), an entry of merchandise that is not liquidated within one year of the date of entry is deemed liquidated at the rate of duty asserted upon entry by the importer, unless the period for liquidation is extended under 19 U.S.C. § 1504(b). On the basis of the ongoing fraud investigation, Customs issued three one-year extensions of the statutory one-year liquidation deadline. The extensions were issued on or about October 22, 1986, mid-to-late October of 1987, and October 18, 1988. *Ford II*, 116 F.Supp.2d at 1219 n. 3. Eventually, on December 1, 1989, Customs liquidated the eleven entries with a 25% duty on all parts asserted to be truck parts in the entries. The total additional duty amounted to approximately $5.3 million. *Ford I*, 157 F.3d at 854. It appears from the record that Customs completed its fraud investigation around March of 1990. *Id.*

Ford timely protested the liquidations, contending, *inter alia*, that the eleven entries of engines and transmissions were deemed liquidated by operation of law at the rate asserted on importation, which (as far as the parts asserted to be truck parts were concerned) was 3.3%. Ford argued that Customs had not shown that "information needed for the proper appraisement or classification of the merchandise [was] not available to the appropriate customs officer" to justify the three extensions under 19 U.S.C. § 1504(b)(1). After Customs denied the protest, Ford paid the

---

**3.** Section 1592(a)(1) proscribes the entry of merchandise into the United States "by fraud, gross negligence, or negligence." The section further provides for procedures for conduct-

ing investigations of fraud, gross negligence, and negligence in the entry of merchandise, as well as the penalties that result from violations.

assessed duties and initiated an action in the Court of International Trade to challenge the liquidations pursuant to 28 U.S.C. § 1581(a). *Ford I*, 157 F.3d at 854. On cross-motions for summary judgment, the court rejected Ford's claim, holding that, as a matter of law, the ongoing fraud investigation justified Customs' issuance of the three extensions before liquidating the entries. *Ford Motor Co. v. United States*, 979 F.Supp. 874 (Ct. Int'l Trade 1997).

## II.

Ford appealed the Court of International Trade's grant of summary judgment to this court, which analyzed whether Ford had presented sufficient evidence to raise a genuine issue of material fact regarding the propriety of Customs' successive extensions that delayed liquidation. In so doing, we interpreted 19 U.S.C. § 1504(b)(1) as requiring both that the investigation allegedly justifying the extension be reasonably expected to produce information regarding appraisement or classification and that Customs seek that information in a reasonable amount of time. *Ford I*, 157 F.3d at 856–57. Applying that standard and construing the evidence in a light most favorable to Ford, we held (1) that "the record does not show that the fraud investigation was reasonably expected to produce information about 'appraisement' and 'classification'" and (2) that "even if Customs expected the investigation to turn up information relevant to appraisement and classification, that expectation alone cannot justify summary judgment," since "the length of the fraud investigation is subject to scrutiny for reasonableness." *Id.* at 857. Accordingly, we

vacated the judgment of the Court of International Trade and remanded for a consideration of the propriety of Customs' extensions and delayed liquidation.

## III.

Pursuant to our remand instructions, the Court of International Trade conducted a three-day trial, during which it heard testimony from numerous witnesses with knowledge of Customs' fraud investigation and the decisions to extend the liquidation deadline under 19 U.S.C. § 1504(b)(1). The court held that Ford had failed to establish either that Customs did not reasonably expect the investigation to uncover information regarding classification and appraisal or that Customs did not act reasonably in pursuing that information over a period of three and a half years. *Ford II*, 116 F.Supp.2d at 1236, 1240. Accordingly, the court determined that Customs' extensions and delayed liquidation complied with 19 U.S.C. § 1504; it therefore entered judgment in favor of the United States. *Id.* at 1247.[4] Ford timely appealed the court's final decision. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## ANALYSIS

### I.

As in effect during the relevant period, section 1504 provided in pertinent part as follows:

(a) **Liquidation.** Except as provided in subsection (b) of this section, an entry of merchandise not liquidated within one year ... shall be deemed liquidated at

---

4. The Court of International Trade rejected Ford's argument that its failure to pay duties before entering the truck engines constituted a correctable clerical error under 19 U.S.C. § 1520(c)(1)—a ruling that Ford does not challenge on appeal. *Id.* at 1241–46.

the rate of duty, value, quantity, and amount of duties asserted at the time of entry by the importer . . .

(b) **Extension.** The Secretary may extend the period in which to liquidate an entry . . . if—

(1) information needed for the proper appraisement or classification of the merchandise is not available to the appropriate customs officer; . . .

19 U.S.C. § 1504(a), (b). In *St. Paul Fire & Marine Insurance, Co. v. United States,* 6 F.3d 763, 768 (Fed.Cir.1993), we acknowledged that Customs possesses broad discretion concerning whether a liquidation extension is warranted under 19 U.S.C. § 1504(b)(1). *See also* 19 U.S.C. § 3 (providing that "the Secretary of the Treasury shall direct the superintendence of the collection of the duties on imports as he shall judge best."). As a result of that discretion, and "the presumption of regularity [that] presume(s) that the import specialist properly performed [his] duties," *St. Paul,* 6 F.3d at 769, Ford bore a heavy burden in attempting to demonstrate that Customs abused its discretionary authority by issuing the liquidation extensions that are at issue.

■■■■ We review the Court of International Trade's conclusions of law *de novo. Bestfoods v. United States,* 260 F.3d 1320, 1323 (Fed.Cir.2001). Following a trial, we review the court's findings of fact for clear error. *See Better Home Plastics Corp. v. United States,* 119 F.3d 969, 971 (Fed.Cir. 1997); *Casio, Inc. v. United States,* 73 F.3d 1095, 1097 (Fed.Cir.1996). The clear error standard requires us to accept the Court of International Trade's findings of fact unless we are left with a "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68

S.Ct. 525, 92 L.Ed. 746 (1948); *Inwood Labs., Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 855, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). Whether Customs abused its discretion either in extending the liquidation deadline under 19 U.S.C. § 1504(b)(1) or in pursuing its fraud investigation under 19 U.S.C. § 1592 is a question of fact. *See St. Paul,* 6 F.3d at 768.

## II.

On appeal, Ford challenges the rulings of the Court of International Trade regarding both issues remanded by this court in *Ford I.* Specifically, Ford argues that Customs abused its discretion by issuing three successive extensions of the statutory liquidation deadline under 19 U.S.C. § 1504(b)(1). According to Ford, the fact that Customs was conducting a fraud investigation under 19 U.S.C. § 1592 did not justify the extensions, since Customs failed to identify a single piece of information "needed for the proper appraisement or classification of the merchandise." 19 U.S.C. § 1504(b)(1). Further, Ford contends, irrespective of whether Customs reasonably expected to uncover such information, the Court of International Trade erred in deeming Customs' efforts in pursuing the fraud investigation reasonable. Ford interprets the trial testimony as revealing an investigation characterized by unjustifiable delays and prolonged periods of inactivity. For that reason, Ford argues that the manner in which the investigation was conducted fell well short of this court's requirement that "Customs [take] a reasonable amount of time to seek" the information related to classification and appraisement. *Ford I,* 157 F.3d at 857. For its part, the government argues that Customs enjoys wide discretion and a presumption that it acted reasonably in con-

ducting the investigation. *See St. Paul,* 6 F.3d at 769. Further, the government contends that the delay in the investigation was justified by its complexity, the heavy caseloads of the agents conducting the investigation, and the diversion of the agents' resources necessitated by the opening of a new Customs office in Bowling Green, Ohio.

Our review in this case has been greatly aided by the Court of International Trade's careful and thorough findings of fact with respect to what occurred between August of 1986, when Customs commenced the fraud investigation, and December of 1989, when it liquidated the eleven entries of motor vehicle transmissions and engines that are at issue. Not surprisingly, neither Ford nor the government challenges those findings of fact. What the parties do dispute are the Court of International Trade's two ultimate findings of fact: that Customs did not abuse its discretion in extending the deadline for liquidation on account of its reasonable belief that it would adduce information relating to classification or appraisal in the fraud investigation; and that Customs took a reasonable amount of time to pursue that information in its investigation. Ford argues that the court erred with respect to both ultimate findings. We agree with Ford on the second point, for we conclude that irrespective of whether Customs reasonably expected the fraud investigation to produce information relating to classification or appraisal, Customs' delay in pursuing the fraud investigation and its resulting delay in liquidating the entries were not reasonable. In other words, while we accept all of the Court of

International Trade's operative findings of fact, we respectfully part company with the court on the ultimate conclusion to be drawn from those facts.[5]

## III.

The eleven entries at issue entered the FTSZ at various times between December of 1985 and February of 1986. The last entry occurred on February 7, 1986, so that the regular one-year period for liquidating all eleven entries at issue would (absent any extensions) have expired, pursuant to 19 U.S.C. § 1504, one year after that date. As noted above, Customs began its fraud investigation in August of 1986 after receiving Agent McNally's referral the previous month. McNally issued the first extension of liquidation in October of 1986.

After reviewing the evidence adduced at trial, the Court of International Trade concluded that Ford had "not demonstrated that the amount of time consumed [by the section 1592 investigation] was unreasonable." *Ford II,* 116 F.Supp.2d at 1239. The court first considered the progress of the fraud investigation under the auspices of Special Agent George Fritz, from its inception in August of 1986 until November of 1987, when the matter was reassigned to Special Agent Charles Kyle, a period of approximately 16 months. During that time, Fritz conducted a series of interviews related to the investigation— the last of which occurred on March 4, 1987. *Id.* The Court of International Trade acknowledged that in the eight months between that interview and the transfer of the investigation to Agent Kyle,

---

5. Our disposition of the case, of course, renders moot the question of whether Customs reasonably believed that the section 1592 investigation would produce information relevant to liquidation.

"it does not appear Fritz conducted additional activities on the case." *Id.* However, the court declined to equate such inactivity with an abuse of Customs' discretion in conducting the investigation, in light of Fritz's "other commitments and time constraints," including other investigations and absences for sick leave, that "limited his ability to work on the case." *Id.* The second extension of liquidation was issued in October of 1987, during this period of inactivity. *Id.* at 1219 n. 3.

After concluding that Customs conducted the section 1592 investigation reasonably under Agent Fritz, the Court of International Trade turned to the progress of the investigation under Agent Kyle. Agent Kyle was responsible for the investigation from November of 1987 through its completion in March of 1990. It was during this period, in October of 1988, that McNally issued the third and final extension of liquidation. *Id.* at 1219 n. 3, 1238–39. It also was during this period that Customs eventually liquidated the eleven entries at issue in December of 1989.

During Kyle's first month leading the investigation, he familiarized himself with the file and determined that, in order to complete the inquiry, he needed to gather additional information and to conduct interviews with various Customs personnel. *Id.* at 1238. However, after that initial determination was made, the investigation lay dormant for over fourteen months, until Kyle met with Fritz and McNally in February of 1989. Thereafter, Agent Kyle conducted several interviews and ultimately completed the investigation around March of 1990. *Id.* at 1240.

Agent Kyle testified that he was unable to complete the investigation more quickly because he was awaiting information he had requested from McNally—who had referred the Ford case for investigation. Kyle also testified that he could not complete the investigation until he interviewed four or five additional witnesses. *Id.* at 1225. He further testified that he was delayed in completing the investigation by his heavy workload, which included 25–50 cases and responsibilities attendant to setting up a new Customs office in Bowling Green. *Id.* at 1239. These responsibilities included "hiring and training staff, obtaining furniture and equipment, and handling all administrative" tasks of the new office. *Id.* Kyle's supervisor, Robert Cortesi, testified that the delay in conducting the Ford investigation was reasonable, in view of Kyle's workload. The Court of International Trade agreed. *Id.* at 1239–40.

■ Having reviewed the record, we are unable to agree with the Court of International Trade's ultimate finding: that Customs did not act unreasonably in terms of the amount of time it took to complete the section 1592 fraud investigation.

The fraud investigation consumed a total of 44 months, from August of 1986, when it was opened, until March of 1990, when it was completed. During that period, liquidation was delayed for approximately 36 months, from the initial one-year statutory deadline that (without any extensions) would have lapsed (for the first entry) in December of 1986, until Customs finally liquidated the entries in December of 1989. Significantly, during the 16 months when Agent Fritz was conducting the investigation, (August of 1986 November of 1987), he devoted hardly any time to the inquiry, and he performed no work on it during the latter half of his tenure (March of 1987 November of 1987). *Ford II,* 116 F.Supp.2d at 1239. Moreover, after the case was transferred to Agent Kyle in November of 1987, aside from reviewing

the progress of the investigation with his supervisor, Kyle performed virtually no substantive work on the investigation in the fourteen months between December of 1987 and February of 1989, when he met with Agents Fritz and McNally.

Though Customs enjoys wide discretion in liquidating entries, that discretion is not unbridled. *St. Paul*, 6 F.3d at 768; *Ford I*, 157 F.3d at 857. Even accepting the Court of International Trade's view of the evidence, in which Agent Fritz's sick time, Agent Kyle's responsibilities in starting the Bowling Green Office, and the workload carried by both agents delayed the fraud investigation, we cannot escape the conclusion that both the manner of conducting the investigation and the length of the investigation were unreasonable. Simply put, the first 30 months of the 44–month investigation (August of 1986 February of 1989) saw almost no substantive work and two periods of inactivity totaling 22 months (March of 1987—November of 1987 and December of 1987—February of 1989). It was during that 30–month period that Customs issued all three extensions of liquidation under section 1504(b)(1).

We do not hold that, in times of natural or national calamity, repeated extensions of liquidation and periods of inactivity could not withstand judicial scrutiny for reasonableness. Customs' delay in this case did not occur in such a setting, however. Rather, Customs sought to explain its delay in conducting the fraud investigation by pointing to typical day-to-day workplace exigencies, such as competing responsibilities, an agent taking sick leave, and the various tasks associated with starting a new office. Acceptance of these exigencies as excuses for Customs' lengthy delay in this case would leave the statutory objective of prompt liquidation, and this court's requirement that any liquidation delays be reasonable, largely meaningless. *See* 19 U.S.C. § 1504; *Ford I*, 157 F.3d at 856–57. Put another way, were we to hold that Customs did not abuse its discretion in issuing the three extensions of liquidation at issue in this case, we would be setting an unacceptably low bar for reasonableness. Accordingly, we hold that Ford proved by a preponderance of the evidence that the length of Customs' investigation and the manner in which Customs conducted the investigation were unreasonable. Consequently, liquidation of the eleven entries at issue was not properly extended under 19 U.S.C. § 1504(b)(1). As a result, the entries must be deemed liquidated under 19 U.S.C. § 1504(a).

## CONCLUSION

For the foregoing reasons, the decision of the Court of International Trade in favor of the United States is reversed. The case is remanded to the court for entry of judgment in favor of Ford.

REVERSED and REMANDED.

BRYSON, Circuit Judge, dissenting.

I respectfully dissent. While I share the majority's concern about the lengthy delays in the investigation of this case, I would not reverse the trial court's decision that, under all the circumstances, the delay was not shown to be unreasonable.

By statute, Customs is accorded broad discretion to obtain extensions for up to four years to liquidate entries. 19 U.S.C. § 1504(b). An extension need not be applied for; rather, Customs may unilaterally obtain extensions of the one-year statutory liquidation period if "the information

needed for the proper appraisement or classification of the merchandise, or for insuring compliance with applicable law, is not available to the Customs Service" or if the importer requests the extension. This court has made clear that Customs enjoys very broad discretion in determining whether to seek extensions as long as the total pre-liquidation period does not exceed four years. *See St. Paul Fire & Marine Ins. Co. v. United States,* 6 F.3d 763, 767–68 (Fed.Cir.1993) (discussing in detail the statutory and regulatory design for obtaining extensions of liquidation). This court set out the governing standard in *St. Paul,* the leading decision on this point:

> Customs may, for statutory purposes and with the requisite notice, employ up to four years to effect liquidation so long as the extensions it grants are not abusive of its discretionary authority. Such an abuse of discretionary authority may arise only when an extension is granted even following elimination of all possible grounds for such an extension. There is, in sum, a narrow limitation on Customs' discretion to extend the period of liquidation.

6 F.3d at 768.

The Court of International Trade in this case held a three-day trial and subsequently wrote a lengthy opinion in which it analyzed in detail the circumstances surrounding the extensions obtained by Customs in this case. For reasons set forth in its opinion, the court concluded that Ford had not met its burden of showing that the amount of time consumed by the investigation was unreasonable; the court therefore held that this case did not fall within the "narrow limitation" on Customs' discretion to obtain extensions of the time for liquidating the subject entries.

The trial court examined the conduct of the two agents who were principally responsible for the investigation during the period in which the three extensions were obtained. With respect to the period August 1986 through November 1987, when the investigation was assigned to Agent Fritz, the trial court noted that "there was activity on the case from the time the case was assigned to Fritz in August 1986 at least through March 4, 1987, when Fritz interviewed Art Trussell, the former Louisville Port Director." The fact that there was no apparent activity on the case for the following eight months, the court explained, "does not show the inactivity was necessarily unreasonable." Rather, the court noted that the evidence showed that Agent Fritz "had other commitments and time constraints which limited his ability to work on the case," including being assigned to other investigations, working as the sole staff at the new Bowling Green office for a 30–day period, and being out on sick leave at the time the investigation was transferred. Based on the evidence adduced at trial, the court concluded that "the time it took Fritz to conduct the Ford investigation, given Fritz's overlapping obligations, cannot be found by this Court to be unreasonable."

The court likewise examined the period between November 1987 and October 1988, when the third extension was obtained. During that period, Agent Kyle was in charge of the investigation. Again, based on the evidence at trial, the court found that the period of delay was not unreasonable. During that period, the court noted, Agent Kyle was waiting for information from another Customs agent, and he also needed to interview four or five witnesses. It was not unreasonable that Agent Kyle failed to conduct those interviews earlier, the court concluded, "as

he had a heavy caseload and had numerous responsibilities in connection with setting up the Bowling Green office during the time in which he was assigned to the case."

The question whether Ford satisfied its burden of establishing that the particular periods of delay were unreasonable under all the circumstances is intensely factual. The majority acknowledges that we must uphold the trial court's finding on the issue of reasonableness unless the trial court was clearly erroneous in reaching that conclusion. I do not believe Ford has satisfied that standard in this case.

In overturning the trial court's conclusion that the investigative delay in this case was not unreasonable, the majority focuses on the two lengthy periods of inactivity in the investigation—the eight-month period between March and November 1987, and the 11–month period between November 1987 October 1988. The majority does not accept the trial court's conclusion that those periods of inactivity were reasonable in light of the competing workload commitments, administrative burdens, and sick leave taken by the agents responsible for the investigation.

That is where I part company with the majority. While long periods of inactivity in an investigation certainly raise questions whether the investigation is being pursued with diligence, the mere fact that there are long periods of inactivity does not render the ensuing delay unreasonable. Presumably, the majority would have been more prepared to find the delays in this case excusable if the agents had taken some investigative steps from time to time rather than doing nothing on the investigation for lengthy periods. The problem is that some work lends itself to being done piecemeal, and some does not. In my view, a delay is not necessarily unreasonable if a busy agent who has many investigations to conduct puts a particular investigation at the end of his queue and does not begin to work on it for an extended period of time.

While it is surely not ideal to have lengthy delays built into an administrative system because of workload levels, it is not unusual. Competing demands are a fact of life, particularly in an investigative bureaucracy in which each agent has multiple investigative responsibilities. In such a setting, investigators often find that it is more efficient to postpone working on one matter until another is completed, rather than attempting to work on multiple matters simultaneously. Nor is this phenomenon peculiar to investigative agents. Others with heavy workloads, such as busy lawyers (and, indeed, even busy judges), often postpone beginning work on particular matters until other matters with more pressing deadlines or earlier spots in the work queue have been completed. For that reason, the fact that no work is done on a particular matter for an extended period of time, or that there are long workload-related periods of delay during which no progress is made on a particular project, does not mean that the delay is unreasonable.

Of course, if Ford had persuaded the trial court that the lack of progress on the investigation was the result of indolence or inattention on the part of the agents or the Customs Service generally, that would be a different matter. But the trial court concluded after hearing three days of evidence in this case that the agents' competing obligations and other factors provided an adequate explanation for the lengthy periods of delay. Because I do not think the trial court committed clear error in that regard, I would affirm.