# United States Court of Appeals for the Federal Circuit

---

**MEYER CORPORATION, U.S.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2021-1932

---

Appeal from the United States Court of International Trade in Nos. 1:13-cv-00154-TJA, 1:13-cv-00181-TJA, 1:13-cv-00182-TJA, 1:13-cv-00226-TJA, 1:13-cv-00227-TJA, 1:13-cv-00258-TJA, 1:13-cv-00259-TJA, 1:13-cv-00266-TJA, 1:13-cv-00322-TJA, 1:13-cv-00323-TJA, 1:13-cv-00405-TJA, 1:14-cv-00118-TJA, 1:14-cv-00277-TJA, 1:15-cv-00018-TJA, 1:15-cv-00019-TJA, 1:15-cv-00091-TJA, 1:15-cv-00092-TJA, 1:15-cv-00191-TJA, 1:15-cv-00332-TJA, 1:16-cv-00112-TJA, 1:16-cv-00271-TJA, 1:17-cv-00186-TJA, Senior Judge Thomas J. Aquilino, Jr.

---

Decided: August 11, 2022

---

JOHN MICHAEL PETERSON, Neville Peterson LLP, New York, NY, argued for plaintiff-appellant. Also represented by PATRICK KLEIN; JOHN DONOHUE, Philadelphia, PA; RICHARD F. O'NEILL, Seattle, WA.

BEVERLY A. FARRELL, International Trade Field Office, United States Department of Justice, New York, NY, argued for defendant-appellee. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, JUSTIN REINHART MILLER; PAULA S. SMITH, Office of the Assistant Chief Counsel, Bureau of Customs and Border Protection, United States Department of Homeland Security, New York, NY.

————————————

Before MOORE, *Chief Judge*, CLEVENGER and HUGHES, *Circuit Judges*.

HUGHES, *Circuit Judge*.

This appeal involves two issues related to duties assessed on cookware that Meyer Corporation, U.S. imported. First, Meyer sought duty-free treatment for cookware manufactured in Thailand. Thailand is a beneficiary developing country under the Generalized System of Preferences, so certain products manufactured there with 35% or more Thai inputs are eligible for duty-free treatment. Materials imported to Thailand from other countries must undergo a "double substantial transformation" in Thailand to count toward the 35%. The United States Court of International Trade ruled that Meyer's pots and pans manufactured in Thailand are not eligible for duty-free treatment because they were made of steel discs from China that underwent only one substantial transformation. The Court of International Trade did not clearly err in finding only one substantial transformation, so we affirm.

Second, Meyer sought to establish the dutiable value of its cookware using the "first-sale" price from affiliated manufacturers to affiliated distributors. Relying on language from our decision in *Nissho Iwai American Corp. v. United States*, 982 F.2d 505 (Fed. Cir. 1992), the Court of International Trade required Meyer to prove that these first sales were not only at arm's length but were also

unaffected by China's status as a nonmarket economy. Finding that Meyer did not prove the absence of "nonmarket influences" for its cookware imported from China or produced with Chinese inputs, the trial court did not allow Meyer to rely on its first-sale prices. The trial court misinterpreted *Nissho Iwai* to impose a requirement beyond what the statute and regulations demand, so we vacate and remand for the trial court to reconsider whether Meyer may rely on its first-sale prices.

## BACKGROUND

This appeal concerns duties that U.S. Customs and Border Protection assessed on cookware imported by Meyer Corporation, U.S. (Meyer). Some cookware was manufactured in Thailand, and some was manufactured in China.

Each piece of cookware manufactured in Thailand began as a steel disc imported from China. In Thailand, the manufacturer used a deep drawing process to produce "shells" having the rough shape and size of the finished cookware. Then, the manufacturer turned the shells into finished cookware in a series of steps including trimming the edges, removing grease, polishing, flattening the bottom, wrapping in plastic, marking with the product's specifications, punching holes for the handle, and attaching the handle.

The manufacturers in Thailand and China sold finished cookware to distributors in Macau and Hong Kong, respectively, and then to the U.S. importer, Meyer. The manufacturers, distributors, and importer are all related, with common parent/shareholder Meyer International Holdings, Ltd.

Meyer requested duty-free treatment for the cookware produced in Thailand, based on Thailand's status as a beneficiary developing country under the Generalized System of Preferences. *Meyer Corp., U.S. v. United States*, No. 13-

00154, 2021 WL 777788, at *3 (Ct. Int'l Trade Mar. 1, 2021) (*Decision*). Meyer also asked Customs to value its cookware based on the first-sale price that its affiliated distributors paid to the manufacturers. *Id.* Following an audit, Customs ultimately denied duty-free treatment. *Id.* at *4; Summons at 2, *Meyer Corp., U.S. v. United States*, No. 13-00154 (Ct. Int'l Trade Apr. 16, 2013), ECF No. 1. Customs also assessed duties based on the second-sale price that Meyer paid to its distributors, rejecting Meyer's request to use the first-sale price. *Decision* at *4; Summons at 2, *Meyer*, No. 13-00154.

Meyer protested Customs' decisions and then appealed to the Court of International Trade. *Decision* at *4. Following a bench trial, the trial court ruled that Meyer failed to prove it was entitled to duty-free treatment for the cookware manufactured in Thailand. *Id.* at *50. It explained that under *Torrington Co. v. United States*, 764 F.2d 1563, 1567 (Fed. Cir. 1985), raw materials from non-beneficiary developing countries must undergo a "double substantial transformation" in the beneficiary developing country to count toward duty-free treatment. *Decision* at *3, *36–37. It found that Meyer had shown that the manufacturer substantially transformed steel discs once, "when a flat blank [wa]s deep drawn into a shell that [wa]s an unfinished pot or pan." *Id.* at *37. But, in the trial court's view, the manufacturer did not substantially transform the input a second time by converting the shell into a finished pot or pan. *Id.* Further, the trial court found that Meyer failed to show that an unfinished shell is a "distinct article of commerce" that is "readily susceptible to trade," as *Torrington* also requires. *Id.* at *38 (citing *Torrington*, 764 F.2d at 1570). Having found that Meyer failed to satisfy the requirements of *Torrington*, the trial court concluded that the steel discs could not count toward the value added in Thailand, and thus Meyer failed to prove its cookware was eligible for duty-free treatment. *Id.*

The trial court also affirmed Customs' decision "to deny 'first sale' treatment." Judgment, *Meyer Corp., U.S. v. United States*, No. 13-00154 (Ct. Int'l Trade Mar. 1, 2021), ECF No. 187. It held that, under our decision in *Nissho Iwai*, an importer wishing to rely on the first-sale price bears the burden to show that the first sales were "(1) bona fide sales that are (2) clearly destined for the United States (3) transacted at arm's length and (4) absent any distortive nonmarket influences." *Decision* at *1, *5 (citing *Nissho Iwai Am. Corp. v. United States*, 982 F.2d 505 (Fed. Cir. 1992)). The trial court suggested that Meyer could prove the absence of nonmarket influences with "the factors used by entities located [in China] to obtain a duty rate other than the country-wide rate" in antidumping proceedings. *Id.* at *2. For both Meyer's Chinese-manufactured products and its Thai-manufactured products made in part from Chinese inputs, the trial court found that Meyer had not provided adequate information to prove that its first sales met the last requirement: that they were free of "market-distortive influence, either with respect to the plaintiff directly or the provision of inputs generally." *Id.* at *6, *51. It thus concluded that Meyer could not rely on the first-sale prices. *Id.* at *50–51.

Meyer appeals the trial court's determinations that its products manufactured in Thailand were not eligible for duty-free treatment and that it could not rely on first-sale prices. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

ANALYSIS

"We review the Court of International Trade's conclusions of law de novo." *Ford Motor Co. v. United States*, 286 F.3d 1335, 1340 (Fed. Cir. 2002). "Following a trial, we review the court's findings of fact for clear error." *Id.*

I

The Generalized System of Preferences statute "represents the United States' participation in a multinational

effort to encourage industrialization in lesser developed countries through international trade." *Torrington*, 764 F.2d at 1565. Under the Act, the President "prepare[s] a list of beneficiary developing countries" and designates eligible products from those countries. *Id.* (citing 19 U.S.C. § 2462). "A designated product imported from a listed country may enter the United States duty free." *Id.* (citing 19 U.S.C. § 2461).

To be eligible, the sum of "the cost or value of the materials produced in the beneficiary developing country" and "the direct costs of processing operations performed in such beneficiary developing country" must be at least 35% of the appraised value of the article. 19 U.S.C. § 2463(a)(2)(A)(ii).

Regulations define materials "produced in the beneficiary developing country" to include materials imported from other countries but "[s]ubstantially transformed in the beneficiary developing country into a new and different article of commerce." 19 C.F.R. § 10.177(a)(2).

In *Torrington*, we interpreted the statute and regulation to require a "dual transformation." 764 F.2d at 1567–68. A raw material from another country must be substantially transformed once to become an intermediate article "produced in the beneficiary developing country" under 19 C.F.R. § 10.177(a), and then a second time to be considered an input into the final product—rather than the final product itself—under 19 U.S.C. § 2463(a)(2)(A)(ii)(I). *Torrington*, 764 F.2d at 1567–68.

The intermediate article cannot be the output of any arbitrary step in the manufacturing process. Instead, under 19 C.F.R. § 10.177(a), it must be an article "of commerce." The "regulation imposes the requirement that the 'new and different' product be commercially recognizable as a different article, i.e., that the 'new and different' article be readily susceptible of trade, and be an item that persons might well wish to buy and acquire for their own

purposes of consumption or production." *Torrington*, 764 F.2d at 1570.

To find a "substantial transformation," we consider whether "an article emerges from a manufacturing process with a name, character, or use which differs from those of the original material subjected to the process." *Id.* at 1568. "The name element . . . has received less weight and is considered 'the weakest evidence of substantial transformation.'" *Koru N. Am. v. United States*, 12 C.I.T. 1120, 1126 (1988) (citation omitted).

The trial court found "no change in character" from a shell to a finished pot or pan. *Decision* at \*37. Analyzing the manufacturing steps after deep drawing, the trial court noted "that there [wa]s no annealing or galvanizing performed or any change in chemical composition or mechanical properties." *Id.* (citing *Ferrostaal Metals v. United States*, 11 C.I.T. 470 (1987)). "Nor was there any significant change in shape or form" because "the drawing process g[ave] the article its final form, not the subsequent finishing operations." *Id.* (citing *Nat'l Hand Tool Corp. v. United States*, 16 C.I.T. 308 (1992), *aff'd*, 989 F.2d 1201 (Fed. Cir. 1993) (per curiam)).

Meyer argues that those specific types of changes are not required; the change in character here is from "producers' goods" to "consumers' goods" as discussed in *Torrington*, 764 F.2d at 1571, and *Midwood Industries, Inc. v. United States*, 64 Cust. Ct. 499, 507 (1970). But Meyer takes references to producers' and consumers' goods out of context. In *Torrington* and *Midwood*, the articles changed from "producers' goods" to "consumers' good" because of substantial changes in shape, form, chemical properties, and mechanical properties. *Torrington*, 764 F.2d at 1571 (citing *Midwood*, 64 Cust. Ct. at 504–07). For example, in *Torrington*, creating the consumers' needles from the producers' swages required changing the shape and form by cutting the swage to the right length, adding a hole, and

sharpening the tip. *Id.* at 1566, 1571. It also involved changing the chemical and mechanical properties by hardening, tempering, and plating the needle. *Id.* Because of these changes, the court considered swages to be producers' goods distinct from finished needles.

Here, the trial court correctly focused its inquiry on manufacturing steps that changed the shape, form, chemical properties, and mechanical properties. It did not clearly err in finding no substantial change in character from the shells to the final product.

The trial court also found "no change in use" because "the use of the [shells] [wa]s predetermined; they w[ould] be finished and used as a specific pot or pan." *Decision* at *37 (citing *Nat'l Hand Tool*, 16 C.I.T. at 311–12). Meyer argues that the district court relied on the wrong test to identify a change in use—rather than consider whether each shell's use is predetermined, the court should have considered whether a consumer can use a shell as a pot or pan. The shells have no handles, making them useless as pots and pans, so Meyer argues that adding a handle changes the use.

The trial court got the test right. In both *Torrington* and *National Hand Tool*, the court considered whether the intermediate article was useful only for producing a specific finished product, not whether it was usable as the finished product. *Compare Torrington*, 764 F.2d at 1566 (finding a change in use because although "the swage is useful solely in the production of sewing-machine needles with a predetermined blade diameter, . . . the resulting needle may vary in other respects (e.g., eye placement, eye size, and needle length)"), *with Nat'l Hand Tool*, 16 C.I.T. at 311 (finding no change in use because "[e]ach component was intended to be incorporated in a particular finished mechanics' hand tool"). Applying this test, the trial court found, and Meyer does not now contest, that each shell was

meant to be finished into a specific model of pot or pan. *Decision* at *37.

Although the record does suggest that the article underwent a change in name, that is not dispositive. Both parties called the intermediate article a "'work in progress' shell[]," *id.* at *42, *30–31, or just a "shell," *id.* at *37. The finished product was a pot or pan. But it is unclear from the record whether "shell" is a convenient term adopted for this litigation or for Meyer's internal use, or if instead it is a common term across the industry. Even so, this difference in name, the least important factor, is not enough to show clear error in the district court's conclusion that there was no second substantial transformation. *See Koru*, 12 C.I.T. at 1126.

The trial court did not clearly err in finding only one substantial transformation. We thus affirm the trial court's denial of duty-free treatment for the cookware manufactured in Thailand. We need not reach Meyer's argument that it satisfied the separate requirement that the shells be an article of commerce susceptible to sale.

II

Customs primarily uses the "transaction value" of imported merchandise as the dutiable value. 19 U.S.C. § 1401a(a)(1). The transaction value "is the price actually paid or payable for the merchandise when sold for exportation to the United States," plus specified additions. 19 U.S.C. § 1401a(b)(1).

To be viable as a basis for valuation, a transaction must meet the requirements of 19 U.S.C. § 1401a(b)(2), including, for transactions "between a related buyer and seller," that either "an examination of the circumstances of the sale of the imported merchandise indicates that the relationship between such buyer and seller did not influence the price actually paid or payable" or "the transaction value . . . closely approximates" a test value. 19 U.S.C.

§ 1401a(b)(2)(B). The corresponding regulation, 19 C.F.R. § 152.103(l)(1), lists ways for Customs to find that the relationship between the buyer and seller did not influence the price, for example, by finding that "the price has been settled in a manner consistent with the normal pricing practices of the industry in question," or that "the price is adequate to ensure recovery of all costs plus a profit which is equivalent to the firm's overall profit."

In *Nissho Iwai American Corp. v. United States*, we addressed which price Customs should use in a multi-tiered import scheme in which all the entities are related—the first-sale price the distributor paid to the manufacturer, or the second-sale price the importer paid to the distributor. 982 F.2d 505, 508–11 (Fed. Cir. 1992). "[O]nce it is determined that both the [first- and second-sale] price[s] are statutorily viable transaction values, the rule is straightforward: the manufacturer's [first-sale] price, rather than the [distributor's second-sale] price . . . , is used as the basis for determining transaction value." *Id.* at 509. Our decision elaborated on the meaning of "statutorily viable": "[t]he manufacturer's price constitutes a viable transaction value when the goods are clearly destined for export to the United States and when the manufacturer and middleman deal with each other at arm's length, in the absence of any non-market influences that affect the legitimacy of the sales price." *Id.*

Here, the trial court articulated four requirements for a viable transaction under *Nissho Iwai*, including that the sale be "(3) transacted at arm's length and (4) absent any distortive nonmarket influences." *Decision* at *1. The court noted that the fourth factor "has generally been neglected" but was relevant here because China "presumptively remains a non-market economy in this and other proceedings," *id.* at *1, *6. The court placed the burden on Meyer to prove that the first sale met these requirements, including to prove "the absence of any market-distortive influences" arising in a nonmarket economy. *Id.* at *2, *5–6

The trial court misinterpreted our decision in *Nissho Iwai* to require any party to show the absence of all "distortive nonmarket influences." There is no basis in the statute for Customs or the court to consider the effects of a nonmarket economy on the transaction value. The statute requires only that "the relationship between [the] buyer and seller did not influence the price actually paid or payable." 19 U.S.C. § 1401a(b)(2)(B). This provision concerns effects of the relationship between the buyer and seller, not effects of government intervention, and especially not with government intervention that affects the industry as a whole. Neither *Nissho Iwai* nor the government's briefing identifies other statutes or regulations that could require Customs or the Court of International Trade to consider whether the goods were sold in a nonmarket economy or were otherwise affected by a nonmarket economy.

When Congress wants to distinguish between market and nonmarket economies in the trade laws, it does so expressly. *E.g.*, 19 U.S.C. §§ 1677b(c), 1671(f)(2), 1677f-1(f)(1) (providing special rules for nonmarket economy countries in antidumping and countervailing duty investigations). Congress has not provided for differing treatment in 19 U.S.C. § 1401a. Further, the trade laws "must be interpreted to be consistent with [international] obligations, absent contrary indications in the statutory language or its legislative history." *Allegheny Ludlum Corp. v. United States*, 367 F.3d 1339, 1348 (Fed. Cir. 2004) (alteration in original) (citation omitted). The General Agreement on Tariffs and Trade (GATT) requires that all Member States be treated equally unless a specific provision authorizes differing treatment. GATT at Art. 1, Oct. 30, 1947, 61 Stat. A-11, 55 U.N.T.S. 194. The GATT valuation agreement, on which § 1401a is based, does not distinguish between "market economy" and "nonmarket economy" countries and says that valuations should be made "without distinction between sources of supply." Agreement on Implementation of Article VII of the General Agreement on Tariffs and Trade

1994 (Customs Valuation Agreement), 1868 U.N.T.S. 279 (1994). The trial court's reading of *Nissho Iwai* creates a risk that Customs will value goods from different countries unequally, even though neither the valuation code nor another specific provision authorizes differing treatment.

With all this in mind, we read *Nissho Iwai* as merely restating the statutory requirements for a transaction value, rather than introducing a new requirement separate from the arm's-length requirement. The decision lays out two requirements, both enumerated in the statute, and then elaborates on the second:

> The manufacturer's price constitutes a viable transaction value when [1] the goods are clearly destined for export to the United States [§ 1401a(b)(1)] and [2] when the manufacturer and the middleman deal with each other at arm's length [§ 1401a(b)(2)(B)], in the absence of any non-market influences that affect the legitimacy of the sales price.

982 F.2d at 509. In context, "nonmarket influences" just refers to influences growing out of the relationship of buyer and seller that distort the "price paid or payable," which Customs must consider under 19 U.S.C. § 1401a(b)(2)(B).

Because the Court of International Trade relied on its misreading of *Nissho Iwai* to reject Meyer's first-sale price, we vacate and remand for the court to reconsider whether Meyer may rely on the first-sale price. We need not reach Meyer's alternative argument that the court should have subjected Meyer's second-sale price to the same nonmarket-influences requirement it imposed on the first-sale price.

\* \* \*

For the reasons set forth above, the decision of the Court of International Trade is

# AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED

COSTS

No costs.